STATE ex rel. WILLIAMS, Relator, *v.* KAMP et al., Respondents.

(No. 7,807.)

(Submitted March 28, 1938.   Decided April 7, 1938.)

[78 Pac. (2d) 585.]

*Mr. H. W. Bunston, Mr. John G. Brown* and *Mr. William A. Brown,* for Relator, submitted a brief; *Mr. Bunston* and *Mr. John G. Brown* argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Mark H. Derr,* Assistant Attorney General, and *Mr. Clarence Hanley,* Special Assistant Attorney General, for Respondents, submitted a brief; *Messrs. Derr* and *Hanley* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This is an original proceeding for a writ of prohibition. Relator is a taxpayer of Big Horn county. Respondents Kamp, McCarty, and Lynde are the members of the board of county commissioners and ex officio the County Welfare Board of Big Horn county. Respondent Krueger is an employee and supervisor of the County Welfare Board.

The proceeding is instituted for the purpose of prohibiting the respondents from passing upon applications for relief to ward Indians of the United States residing in Big Horn county, and from paying out moneys from the poor fund and other funds of Big Horn county for direct relief to such Indians, which it is alleged the respondents have threatened to do under Chapter 82, Laws of 1937.

Respondents by answer claim the right to pass upon such applications and to pay out such funds for direct relief to Indian wards under authority granted by that Chapter. By their answer they also request a declaratory judgment declaring their rights under Chapter 82 with respect to other forms of relief therein provided for, as applied to Indians, both ward and nonward. It will thus be seen that determination of the questions presented depends upon the construction to be placed upon Chapter 82.

In construing a statute, the intention of the legislature is ▮ the controlling consideration, and, to ascertain the reason and meaning of particular provisions of doubtful meaning, courts may resort to the history of the times and the cause or necessity influencing the passage of the Act. (*Lerch* v. *Missoula Brick*

*& Tile Co.*, 45 Mont. 314, 123 Pac. 25, Ann. Cas. 1914A, 346; *Fergus Motor Co.* v. *Sorenson*, 73 Mont. 122, 235 Pac. 422.)

Because of the nation-wide problem of unemployment and the consequent destitution and need of millions of people caused thereby (facts concerning which are set out at length by the court in the case of *Steward Machine Co.* v. *Davis*, 301 U. S. 548, 57 Sup. Ct. 883, 81 L. Ed. 1279, 109 A. L. R. 1293), the Congress of the United States on August 14, 1935, passed an Act known as the Social Security Act (49 Stat. 620, 42 U. S. C. A., chap. 7, secs. 301–1305). The title of that Act reads: "To provide for the general welfare by establishing a system of Federal old-age benefits, and by enabling the several States to make more adequate provision for aged persons, blind persons, dependent and crippled children, maternal and child welfare, public health and the administration of their unemployment compensation laws; to establish a Social Security Board; to raise revenue; and for other purposes." Title I of that Act is entitled: "Grants to States for Old-Age Assistance." Title III is entitled: "Grants to States for Unemployment Compensation Administration." Title IV is entitled: "Grants to States for Aid to Dependent Children." Title V is entitled: "Grants to States for Maternal and Child Welfare." Title X is entitled: "Grants to States for Aid to the Blind." It is sufficient to say of that Act that it was designed to assist the states in bearing the financial burden of caring for their needy and destitute.

That Act specifically provided that "the sums made available under this section shall be used for making payments to states which have submitted, and had approved by the Social Security Board established by Title VII, state plans for old-age assistance." (Sec. 1, 42 U. S. C. A., sec. 302.) By section 2 of the Act (42 U. S. C. A., sec. 302), there were enumerated several provisions which the state plan must embrace. That section then provided that the board "shall not approve any plan which imposes, as a condition of eligibility for old-age assistance under the plan * * * any residence requirement which excludes any resident of the state who has resided therein five years during

the nine years immediately preceding the application for old-age assistance and has resided therein continuously for one year immediately preceding the application; or (3) any citizenship requirement which excludes any citizen of the United States." An identical provision was made under Title X, for aid to the blind. (Sec. 1002, 42 U. S. C. A., sec. 1202.)

Under Title IV it was provided that the board shall not approve any state plan for aid to dependent children "which imposes as a condition of eligibility for aid to dependent children, a residence requirement which denies aid with respect to any child residing in the state (1) who has resided in the state for one year immediately preceding the application for such aid, or (2) who was born within the state within one year immediately preceding the application, if its mother has resided in the state for one year immediately preceding the birth.". (Section 402, 42 U. S. C. A., sec. 602.) While Title V, 42 U. S. C. A., sec. 701 et seq., relating to grants for maternal and child welfare, does not expressly contain such a clause, we think it is clear from its context that it is intended to cover all who are residents of the state.

The obvious purpose of Chapter 82, Laws of 1937, was to cooperate with the federal government in caring for the needy and unfortunate. The aim of the legislature of Montana was to pass such a law that would meet with the conditions prescribed by Congress before the plan could be approved and the grants could be obtained from the United States.

Chapter 82 was introduced in the legislature on February 8, 1937. When first introduced, the bill made no reference to Indians. Section VII of Part I of the Act, as first introduced, provided in part: "The state department shall * * * (h) act as the agent of the federal government in public welfare matters of mutual concern in conformity with this Act and the federal Social Security Act, and in the administration of any federal funds granted to the state to aid in the purposes and functions of the state department." It is to be observed that, as first introduced, this section mentioned "federal funds

granted to the state.'' On February 26 there was submitted an amendment to this section which was finally adopted. The amendment did not change the foregoing, but simply added this paragraph: ''If grants from the federal government are contingent upon state funds for the provisions to assistance to Indians, all Indians qualified for assistance hereunder to which the federal government contributes, and who are enrolled on an Indian reservation in the State of Montana, or who are of Indian blood and have resided in the State of Montana for five years during the nine years immediately preceding application and has resided within the State of Montana continuously for one year immediately preceding application or have not received their patent in fee to any tribal allotment shall be allowed assistance hereunder in the county in which he resides, but for assistance paid to him the state fund shall not be reimbursed by the county.'' Thus the questions involved here depend upon the meaning of this paragraph.

To ascertain the purpose and intent of the amendment, it is well to keep in mind that, after an Indian has been awarded a patent in fee to any tribal allotment, he is emancipated and becomes amenable to and is entitled to the benefits of all the laws of the state in which he resides. (25 U. S. C. A., sec. 349.) It was natural to suppose that the federal government would provide for those ward Indians, if any, in need of relief. However, the broad language of the federal Social Security Act on its face made the grants to the states contingent upon the fact that no citizenship requirement should exclude any citizen of the United States from relief benefits. Indians are citizens of the United States. (8 U. S. C. A., sec. 3; *State* v. *Big Sheep*, 75 Mont. 219, 243 Pac. 1067.)

The Montana legislature, confronted with the question of choosing to accept or reject the federal grants, chose to accept them. To do this it was obliged to meet the conditions imposed. It wrote into Chapter 82 the clause quoted above in order to meet the conditions imposed by Congress upon the acceptance of the grants. At the time Chapter 82 was enacted—in fact when

the bill was first introduced—there was pending in Congress a bill to amend the federal Social Security Act by relieving the states from caring for ward Indians. That proposed amendment was in part as follows: ''Section 1201. Nothing contained in this Act shall be construed to require any State plan to include Indians who are wards of the United States; and the board shall not refuse to approve any State plan, and no payments with respect to any State plan shall be withheld, because such Indians are excluded from the benefits of such plan.''

The clause in subdivision (h) was enacted, we think, in view of the possibility that Congress would enact the bill relieving the states from caring for ward Indians. That is the obvious reason for starting the clause with the word ''if.'' It is our view that the quoted clause was enacted in order to make sure of the federal grants by making certain that the state plan · would meet with the approval of the federal board. This is apparent from the fact that the residential requirements of those Indians embraced within subdivision (h) were made exactly the same as the conditions named within the federal Act, whereas as to others than those embraced in subdivision (h) the residential requirements entitling the applicants to relief are much less. (Sec. II, Part II.)

Keeping in mind, then, the obvious purpose of the clause in ▇▇ subdivision (h), the next question is, What Indians are embraced within its terms? We think that consideration of ward Indians only gave rise to this provision. As to emancipated Indians, they are entitled to all the rights and privileges of white residents. There was no reason to legislate with reference to them any differently from whites or people of other races. There was some reason for different treatment of ward Indians, particularly in view of the bill pending in Congress to relieve the states from providing relief as to them. As to emancipated Indians, the counties must bear their proportion of relief of all kinds under Chapter 82. Ward Indians are entitled to all the relief provided for under Chapter 82 to which the federal government contributes by virtue of the federal Social Security Act, or otherwise, but that relief must be pro-

vided by the state, and the state fund shall not be reimbursed by the county.

The clause in subdivision (h), section VII, Part I, reading "to which the federal government contributes" does not confine the relief to those forms of assistance contributed to by the federal government under the federal Social Security Act. Congress has otherwise made provision for contributing to the care and assistance of Indians. (Title 25 U. S. C. A., sec. 13.) Hence, as to ward Indians in need of general relief, it must be provided by the state without reimbursement by the county.

Section VI of Part II, provides in part: "Medical aid and ██ services and hospitalization for persons unable to provide such necessities for themselves are hereby declared to be the legal and financial duty and responsibility of the board of county commissioners, payable from the county poor fund." This is a general provision and makes the county liable for all such services to all persons. Subdivision (h) of section VII, Part I, is a special provision dealing with Indians only, and, as we have interpreted it, when applied to ward Indians, it is controlling over other general provisions of the Act, and therefore controls over section VI, Part II. In consequence, medical aid and services and hospitalization of ward Indians, not adequately provided for by the federal government, must be provided by the state without reimbursement by the county.

To arrive at this result, we are forced to construe the last ██ "or" in subdivision (h) to mean "and." That this is its meaning is apparent when it is remembered that it was only those Indians who had not received patent in fee that the proposed bill before Congress dealt with, and it was only those Indians concerning whom there is any logical reason for a different rule. This court, in order to carry out the obvious intent of the legislature, may correct manifest error in a statute, so long as no specific provision is abrogated. (*State ex rel. Griffin* v. *Greene,* 104 Mont. 460, 67 Pac. (2d) 995.)

We have heretofore held that "may" sometimes means "must" (*State ex rel. Malott* v. *Board of County Commrs.,* 86

Mont. 595, 285 Pac. 932), and to carry out what appears to have been the legislative intent, we are permitted to hold that "or" means "and." (*State ex rel. Corry* v. *Cooney,* 70 Mont. 355, 225 Pac. 1007; *State ex rel. Hodgdon* v. *District Court,* 33 Mont. 119, 82 Pac. 663.)

Since the petition before us relates to general relief to ward Indians, the county is not required to reimburse the state fund, and the writ applied for should issue to prevent the expenditure of county funds for that purpose.

Since we have held that the state must, unless or until Congress provides otherwise, provide relief to needy ward Indians without contribution from the county, it follows that the state, and not the county, will be financially interested in satisfying itself that the applicants are in need of relief. Since the Act makes no different arrangement for passing upon applications for relief to ward Indians from that applied to others, the county board has authority to pass upon such applications, and the state's rights are fully protected by having the right to review, on its own motion, any decision of the county board. (Section XII, Part I.)

The question arises out of what appropriation can the state disburse funds for general relief, medical aid, and hospitalization to needy ward Indians? The answer is: By the appropriation made in Part VIII, section IV, subdivision (6), of the Act which provides: "For the purpose of general relief and contingencies the sum of six hundred thousand dollars ($600,000.00) for each annual period as in this section above set forth."

The writ applied for will issue to restrain the payment of county funds to ward Indians for any purpose, but in other respects the writ is denied.

This court finds and determines that the respondent officers of Big Horn county appeared and made defense in this proceeding in good faith. In consequence, by virtue of sections 9858 and 9864, Revised Codes, the relator, having made proper demand therefor, is entitled to recover the damages which he has sustained as a result of the proceeding, including a reason-

able attorney's fee, together with costs which shall be a proper claim against Big Horn county.

Mr. Chief Justice Sands and Associate Justices Stewart, Anderson and Morris concur.

Rehearing denied April 21, 1938.